UNITED STATES BANKRUPTCY COURT FOR
EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Case No. 16-21329-gmh |
| MICHAEL A. GRAL, | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | Hon. G. Michael Halfenger |
| | ) | |
| | ) | |

**OFFICIAL COMMITTEE OF UNSECURED CREDITOR'S MOTION
TO CONVERT CASE TO CHAPTER 7, OR, ALTERNATIVELY, TO DISMISS**

Three years ago, Debtor Michael A. Gral filed his voluntary petition for relief under chapter 11 of the Bankruptcy Code. During that time, and notwithstanding various efforts to move the case forward, including global mediation, Debtor has failed to even so much as obtain approval of a disclosure statement. Most recently, the Official Committee of Unsecured Creditors' (the "UCC") current counsel has sought to set aside the most divisive issues to work with Debtor on finding common ground that might benefit all parties. Still, the Debtor has been unable to identify any significant value in the estate that would afford any meaningful rehabilitation. Instead, the Debtor's efforts have culminated in a Fourth Amended Plan [Dkt. #1619] that, even taking the Debtor's optimistic assumptions at face value, offers creditors almost no material recovery despite allowing the Debtor to retain all of his interest in his properties. Such a plan patently violates the absolute priority rule and is unconfirmable. Without any reasonable expectation that the Debtor will be able to effectuate a plan and given the further erosion of the estate by mounting costs here and due to creditor actions against non-debtor entities that constitute the principal assets in this case, the UCC respectfully now moves the Court to convert or, alternatively, dismiss this case.

# BACKGROUND

## I. The Debtor's Fourth Amended Plan of Reorganization Is Representative of the Types of Plan that Debtor Is Willing to Propose and Affords a Convenient "Best-Case" Summary of Debtor's Principal Assets and Liabilities.

During this case, Debtor has filed five proposed plans of reorganization. Most recently, on December 28, 2018, the Debtor filed its Fourth Amended Plan of Reorganization [Dkt. #1619] (the "Fourth Amended Plan"). While this Motion is not intended as *de facto* confirmation objection and the UCC makes no attempt to raise all objections that it might at confirmation, a review of the most recent plan provides a representative example of the type of plan that the Debtor is willing to propose. Such review also serves as a convenient means to summarize the Debtor's views of the principal assets and liabilities of this bankruptcy estate.

### A. Debtor Proposes to Commit a Substantial Portion of the Bankruptcy Estates' Assets to Paying Down Mortgages on His Residence.

As a central element of any of Debtor's filed plans, the Debtor proposes to make substantial monthly payments on the first and second mortgages secured by the Debtor's homestead. (*See* 4th Am. Plan §§ 4.1 & 4.2.) In his Fourth Amended Plan, Debtor asserts that the first and second mortgages on his residence total at least $963,350.46 as of late 2016. (*Id.*) The Debtor asserts that such liens are fully secured implying that the homestead has value of nearly $1 million. (*Id.*) Debtor separately classifies Park Bank's $250,000 junior lien on his residence as entirely unsecured and proposes stripping such lien while paying Park Bank no distribution on such claim, contending that such debt is fully collateralized by the assets of other persons. (*Id.* §4.3.)

As to the mortgages, Debtor proposes making combined monthly payments of $4,904.80 for ten years (totaling at least $588,576) at which time such notes will mature. (*Id.* §§ 4.1 & 4.2.) The Debtor also proposes to escrow additional amounts to cover annual real estate taxes.

(*Id.* § 4.1.)  Debtor proposes to retain his interest in the residence making Debtor the principal beneficiary of the nearly $600,000 of equity created by mortgage payments, stripping of Park Bank's junior lien, and the payment of annual real estate taxes.

> **B.  At the Same Time, Even Accepting All Debtor's Predictions, Debtor's Proposed Plan Affords No Meaningful Recovery to Unsecured Creditors.**

The Debtor proposes treatment of unsecured claims in Classes 7, 8 and 9 of the Fourth Amended Plan.  (4th Am. Plan §§ 5.2-5.4.)  Debtor classifies "unsecured Claims of guaranteed loans" as Class 7 claims, noting that such class includes Park Bank.  (*Id*. at § 5.2.)  Debtor proposes that such claims will receive no payments.  (*Id*.)  While Debtor nominally places the Bielinski Brothers Builders, Inc.'s ("BBB") unsecured claim in excess of $3,800,000 in its own class, Class 8, Debtor also states that the BBB's claim "shall otherwise be classified as a Class 9 General Unsecured Creditor."  (*Id*. at § 5.3.)  Debtor defines Class 9 as other General Unsecured Claims that Debtor asserts total $10,746,402.00, of which Debtor says $2,437,354 are "Insider Claims" which shall receive no distribution under the Plan.  (*Id*. at §5.4.)  Thus, general unsecured creditor claims entitled to share in any distribution total $8,309,048.

Debtor proposes to pay Class 9 creditors *pro rata* shares of the following distributions: (a) $30,000 on the effective date, (b) $50,000 within one year of the effective date, and (c) $10,000 a year for ten years commencing on December 30, 2020.  (*Id.* § 5.4(a)-(c).)  Such payments correspond to distributions to unsecured creditors of approximately a third of a percent on the effective date, three-fifths of a percent within a year, and just over a tenth of percent annually for ten years beginning in two years.  During each of those years alone, Debtor (retaining his interest in the residence) would be benefiting from annual mortgage payments of at least $58,857.60 plus escrowed real estate taxes.

3

In addition to those set distributions, Debtor further proposes that general unsecured creditors will receive a portion of proceeds that flow to the debtor on account of his interest in certain non-debtor entities who Debtor asserts will sell their respective interests in certain real estate in 2020 and 2021. (4th Am. Plan § 5.4(d)-(f).) For each sale, Debtor posits an expected sale price and deducts expected mortgages, closing costs and tax adjustments. The Debtor then assumes that a portion of the proceeds equal to his fractional ownership interest in the intervening holding company will entirely flow through to his bankruptcy estate. Citing a need "to pay other obligations," Debtor proposes to "split" such proceeds with general unsecured creditors. Notably, nothing in the Plan binds the non-debtor entities to effectuate such sales, nor ensures that the proceeds from such sales will not be subject to the superior claims of those non-debtor's creditors. Still, taking all of the Debtor's asserted numbers at face value, Debtor asserts that general unsecured creditors would receive *pro rata* distributions of at least the following amounts: (a) $100,000 from the sale of the single tenant retail building owned by Integral Investments Silver Spring, LLC in or before 2020; (b) $50,000 from the sale of the 7-unit apartment building owed by Integral 2545 Stowell, LLC in or before 2021; and (c) $75,000 from the sale of the 7-unit apartment building owned by Integral 2314 Wyoming, LLC. (4th Am. Plan § 5.4 (d)-(f).) Unaddressed in Debtor's plan, each of those properties are presently in foreclosure or have been forced to file their own bankruptcy cases.

Finally, Debtor predicts that the real estate held by Capital Ventures (wholly-owned 100% by Debtor) will appreciate sufficiently to allow Capital Ventures to complete a refinancing to extract approximately $300,000 in equity in 2025 and another $600,000 in 2030, netting general unsecured creditors recoveries of $150,000 and $300,000 after "splitting" the proceeds with Debtor. (*Id.* § 5.4(g) & (h).)

Assuming all of Debtor's forecasts come to pass, general unsecured creditors would receive payments over the next 11 years totaling $855,000, representing an approximate 10% recover as the "best case" scenario. Creditors would not realize the largest portion of such recovery for more than a decade. To the extent that any of Debtor's predictions fail to materialize, unsecured creditors bear nearly all of the risk of receiving substantially less.

## II. As the Non-Debtors in which Debtor holds an Ownership Interest Become Subject to Actions by Their Own Creditors, the Debtor's Estate Is Evaporating.

The Debtor purports to principally fund his plan through the proceeds he says will flow to him on account of his 50% ownership in Integral LLC, which in turn owns the following single asset holding companies: (i) Integral Investments Silver Springs, LLC ("Integral Silver Springs"), (ii) Integral 3545 Stowell, LLC ("Integral Stowell"), and (iii) Integral 2314 Wyoming, LLC ("Integral Wyoming," and collectively the "Integral Real Estate Entities"). Debtor posits that in 2020 and 2021, those entities will sell their real estate generating proceeds half of which will flow through Integral LLC to the Debtor. (The Debtor also counts on drawing down the equity twice – once in 2025 and again in 2030 -- from Capital Ventures.) Yet, as described below, each of the Integral Real Estate Entities are themselves subject to impending foreclosures or recently filed contested bankruptcy cases of their own.

Integral Stowell. Apparently precipitated by Park Bank's pending foreclosure action against its real property, Integral Stowell filed its own bankruptcy case on January 22, 2019. (*See In re Integral 2545 Stowell, LLC*, No. 19-20553 (E.D. Wisc.).) Debtor assumed in its Fourth Amended Plan that Integral Stowell would sell its real estate for $1 million subject to a mortgage of $600,000, which roughly corresponded to its scheduled assets and liabilities. However, in the wake of its bankruptcy filing, such real estate will also necessarily bear the administrative costs of its bankruptcy estate, including any legal fees that the Park Bank's

oversecured mortgage may entitled it. Based on a review of its less than a month-old bankruptcy docket, Integral Stowell already faces a highly adversarial process that to date includes an adversary proceeding against Park Bank, Park Bank's opposition to the Debtor's motion to retain counsel, and a contested cash collateral fight.

Integral Wyoming. In May 2018, Park Bank filed a foreclosure action against Integral 2314 Wyoming, LLC. On January 25, 2019, Park Bank filed a motion for summary judgment against Integral 2314 Wyoming, LLC.

Integral Silver Springs. Likewise, in May 2018, Park Bank also filed a foreclosure action against Integral Silver Springs and filed its motion for summary judgment in November 2018. Such motion now appears to be fully briefed and has been taken under advisement by the Milwaukee Circuit Court.

Integral LLC  Moreover, Part Bank has also filed a civil action seeking a money judgment against Integral LLC (*see Park Bank v. Integral LLC* (No. 2018-CV-4817 (Milwaukee County Circuit Court)) – the owner of the Integral Real Estate Entities in which the Debtor holds a 50% interest. Thus, even if the administrative costs of the Integral Real Estate Entities' pending bankruptcies and foreclosures do not fully erode any proceeds from the sale of their real estate, any such proceeds appear to be further subject to the claims of Integral LLC's creditors.

Given that nearly all of the properties relied on by the debtor in its Fourth Amended Plan face impending foreclosure and/or bankruptcy cases of their own, it is unclear what assets remain for the Debtor to attempt an already improbable reorganization. As described below, given these circumstances, "cause" to convert or dismiss is ample, and the Court should swiftly do so.

6

Case 16-21329-gmh    Doc 1635    Filed 02/20/19    Page 6 of 17

# ARGUMENT

While chapter 11 can provide an opportunity to preserve viable businesses, maximize creditors' returns, or even just provide a forum for a negotiated resolution of a debtor's case, "chapter 11 is not a panacea for every debtor in distress." 7 COLLIER ON BANKRUPTCY ¶ 1112.05[5][b]] (Richard Levin & Henry J. Sommer eds., 16th ed). The costs of a chapter 11 case can quickly outstrip it benefits. Accordingly, under Section 1112, Congress provided for the conversion or dismissal of chapter 11 cases. While such a motion "may bring to the court a variety of difficult choices that otherwise be left to the negotiating table, this is one of [Section 1112(b)'s] chief virtues." *Id.* "It permits the court to evaluate whether the process is worth the effort, or, conversely, whether the process continues simply because the parties are forced to participate." *Id.* Unfortunately, that time has come in this case. With so few remaining assets and substantial and mounting claims, this chapter 11 case is no longer viable, if it ever was, and should now be converted.

## I. As the Debtor is Unable to Confirm a Chapter 11 Plan Here, the Court Must Convert or Dismiss this Case.

The Bankruptcy Code gives courts "substantial discretion to dismiss a Chapter 11 case in which the debtor files an untenable plan of reorganization." *Toibb v. Radloff*, 501 U.S. 157, 165 (1991). Courts have widely recognized that cause exists to convert a chapter 11 case where "it is unreasonable to expect that a plan could be confirmed." *In re Aurora Memory Care LLC,* 589 B.R. 631, 640 (Bankr. N.D. Ill. 2018); s*ee also In re Bartle*, 560 F.3d 724, 730 (7th Cir. 2009) (citing *In re Woodbrook Assocs.*, 19 F.3d 312, 316 (7th Cir. 1994)); *In re Am. Capital Equip.*, *LLC,* 688 F. 3d 145, n.10 (3d Cir. 2012) (recognizing that "inability to effectuate a plan" remains basis for dismissal). Moreover, conversion or dismissal "is appropriate where the court finds that

7

the proposed plan is not feasible and that a feasible plan is not possible." *In re 3 Ram, Inc.,* 343 B.R. 113, 117-18 (Bankr. E.D. Pa. 2006) (citations omitted).

Here, Debtor has proposed a plan that purports to pay general unsecured creditors a *di minimis* distribution while Debtor simultaneously retains his interest in his assets. Moreover, the Debtor proposes to pay most of such distributions to creditors more than a decade in the future funded by the sale of real estate by non-debtor entities based on highly speculative contingencies. Perhaps unsurprisingly, the Debtor's most significant unsecured creditors have expressed an unwillingness to consent to such plan. Accordingly, to confirm his plan (or any similar version of it), the Debtor would be required to "cram-down" such plan over their objections. However, the absolute priority rule precludes the Debtor as a matter of law from doing so. Given his inability to effectuate any plan of reorganization, cause exists to covert or dismiss to avoid requiring the Debtor and his creditors to continue to engage in what has become a fruitless endeavor.

### A. The Debtor is Precluded from Confirming His Plan (or Any Similar Plan That He Might Propose) Because It Violates the Absolute Priority Rule.

An individual debtor may confirm a chapter 11 plan of reorganization in one of two ways. First, the debtor may demonstrate that its proposed plan complies with each of paragraph Section 1129(a), including the so-called unanimity requirement of Section 1129(a)(8). To satisfy Section 1129(a)(8), the Debtor must demonstrate that each impaired class of claims has accepted the plan. For a class to accept a plan, Section 1126(a) of the Bankruptcy Code requires at least a majority vote to accept by number of claims and a supermajority vote in favor by the amount of claims. *Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. Lasalle St. P'ship*, 526 U.S. 434, 441 n.12 ("A class of creditors accepts if a majority of the creditors and those holding two-thirds of the total dollar amount of the claims within that class vote to approve the plan. § 1126(c).").

Here, the Debtor cannot reasonably expect to obtain unanimous approval of its plan. First, in each of his five versions of his plan filed to-date, the Debtor has placed the unsecured claim of BBB into its own class. In the current Fourth Amended Plan, Debtor designates such class as Class 8 Claims. (4th Am. Plan § 5.3.) In that BBB has repeatedly expressed its unwillingness to consent to the Debtor's proposed plans that, among other things, pays it a fraction of its claim while the Debtor retains his interest in his assets, such class alone precludes the Debtor from satisfying Section 1129(a)(8). Further, the Debtor has also described Class 7 claims as the "Unsecured Claims of guaranteed loans" noting that such class includes Park Bank. (*Id*. at § 5.2.) Likewise, the Debtor defines Class 4 claims to consist exclusively of Park Bank's junior lien on the Debtor's residence. (*Id*. at §4.3.) The Fourth Amended Plan provides that both Classes 4 and 7 will receive no distribution under the Plan making it unreasonable to expect either of those classes to consent to a plan that proposes to pay them nothing.

Finally, Class 9 claims purporting to consist of general unsecured claims totaling $8,309,048.[1] (*See* 4th Am. Plan §5.4.) Of the approximately $8.3 million of remaining Class 9 claims, UCC member SB1 Cedarburg, LLC ("SB1") holds an unsecured claim of $3,159,943 representing at least 38% of Class 9 claims. Like BBB, SB1 is unlikely to consent to its treatment under any of Debtor's proposed plan. Thus, even if <u>every</u> other Class 9 claimant (other than SB1) voted in favor of the Fourth Amended Plan, the Debtor would still lack the dollar amount supermajority required for acceptance by Class 9 claimants.

---

[1] It is unclear from Debtor's Fourth Amended Plan whether Debtor's calculation of total claims includes BBB's claim or not. For purposes of the following illustration, the UCC will assume the BBB's more than $3.8 million claim is a separate Class 8 claim, but recognize that were they to be included in Class 9, Class 9 would only become less likely to vote in favor of Debtor's proposed plan.

9

Unable to satisfy Section 1129(a)(8), Debtor can then only confirm his proposed plan by "cramming it down" over the objection of dissenting classes. However, as in every previous iteration of his plan, Debtor insists that he retain all of his property interests even while denying any recovery to Class 4 and 7 claims, and providing a *di minimis* and speculative recovery to Class 8 and 9 claims of general unsecured creditors. (*See, e.g.,* 4th Am. Plan §5.5 (defining Class 10 claims to consist of Debtors interest "in his properties and entity ownership interest, which the Debtor shall retain.")) In so doing, Debtor's plan to reorganize is doomed as matter of law in that it violates the absolute priority rule set forth in 11 U.S.C. § 1129(b)(2)(B)(ii).

A plan that satisfies every part of section 1129(a), except for the unanimity requirement of (a)(8), may still be confirmed "if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." 11 U.S.C. § 1129(b)(1). The absolute priority rule emanates from this fair and equitable requirement. *203 N. Lasalle*, 526 U.S. at 442. In short, the absolute priority rule, codified at 11 U.S.C. § 1129(b)(2)(B), provides that a dissenting class of unsecured creditors must be paid <u>in full</u> before a debtor can retain property under a plan of reorganization. *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 208 (1988). The rule arose from the concern that because a debtor proposed its own reorganization plan, the plan could be "too good a deal for the debtor's owners." *203 N. Lasalle*, 526 U.S. at 444. Indeed, under the essential elements of Debtor's proposed plans to date, Debtor benefits from the following: (a) substantial payment of the mortgages securing his more than million dollar residence; (b) retention of his ownership interests in non-debtor entities that afford him a six-figure income over more than the next decade for managing his family's real estate interests; and (c) splitting with general unsecured creditors any (speculative) proceeds that might flow to him on account of his indirect interest the

Integral Real Estate Entities. While retaining these property interests, the Debtor proposes to pay general unsecured creditors – at best – approximately 10% of their claims and then only over the next decade or so. The absolute priority rule categorically bars confirmation of such a plan.

To be certain, although the matter of some initial academic debate in the wake of the 2005 amendments to the Bankruptcy Code, courts, including all five Circuit Court of Appeals to have considered the matter as well as other judges in this District, have widely concluded that individual debtors must satisfy the absolute priority rule in order to confirm chapter 11 plan over the objection of impaired classes of unsecured creditors. *See Zachary v. Cal. Bank & Trust*, 811 F.3d 1191, 1199 (9th Cir. 2016); *Ice House Am., LLC v. Cardin*, 751 F.3d 734, 740 (6th Cir. 2014); *In re Lively*, 717 F.3d 406, 410 (5th Cir. 2013); *In re Stephens*, 704 F.3d 1279, 1286-87 (10th Cir. 2013); *In re Maharaj*, 681 F.3d 558, 572-74 (4th Cir. 2012); *In re Gerard*, 495 B.R. 850, 854-56 (Bankr. E.D. Wis. 2013). Therefore, as the Debtor is unable as a matter law to confirm any plan that he might reasonably be expected to propose, cause exists requiring the Court to convert or dismiss this case.

## II. The Bankruptcy Estate Continues to Diminish While There is No Reasonable Likelihood of Rehabilitation.

Under Section 1124(b)(4)(A), cause to convert or dismiss expressly exists where there is a "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation." *See In re Creekside Senior Apts., L.P.* 489 B.R. 51, 61 (6th. Cir. B.A.P. 2013) (providing that Section 112(b)(4)(A) required two-pronged showing). Both conditions exist here:

First, Debtor's bankruptcy estate is diminishing in value. In his monthly operating reports, the Debtor reports a persistent and continuing negative cash flow throughout this case. Exhibit A reflects a summary of the net income reported by the Debtor in each of its monthly

11

operating reports filed since inception of this case. For the 25-month period from January 1, 2017, through January 31, 2019, Debtor has reported total income of *negative* $295,792.84, or an average loss of more than $11,831 per month. Such losses have been continuous where the Debtor reported losses in 21 of the most recent 25 months. In fact, the Debtor's operating reports likely understate the Debtor's losses as they fail to account for accrued but unpaid administrative expenses, including unpaid professional fees.

More fundamentally, Debtor's most recent proposed plan relies on anticipated proceeds from the sale of various real property by the Integral Real Estate Entities. Yet, each of those entities are facing impending foreclosures or contested bankruptcies and the attendant administrative costs to those proceedings will further erode the already thin value that Debtor predicts will inure to the benefit of this bankruptcy estate in 2-3 years. Moreover, Integral LLC – the direct owner of the real estate entities and the entity through which any such proceeds would necessarily flow to the Debtor – is itself subject to claims for money judgment by Park Bank creating the very real possibility that any proceeds from the proposed non-debtor sales of real estate will never reach this bankruptcy estate. Such erosion in value – particularly given the Debtor's persistent operating losses throughout the three years that this case has been pending – more than satisfies the first prong of Section 1124(b)(4)(A). *See Loop Corp. v. United States Tr.*, 379 F. 3d 511, 515-16 (8th Cir. 2004) (affirming bankruptcy court's conclusion that ongoing expenses associated with administering estates constituted a continuing loss to or diminution the estate for purposes of Section 1112(b)") (internal quotation omitted).

Under the second prong of Section 1112(b)(4)(A), the debtor must have a reasonable likelihood of "rehabilitation" to warrant continuing a chapter 11 case in the face of eroding value. In this context, "rehabilitation" is broader and more demanding than whether the debtor

can confirm a plan of "reorganization." *See In re Brutsche*, 476 B.R. 298, 301-02 (Bankr. N. Mex. 2012) (holding individual debtor's liquidation plan was not a "rehabilitation"). "[T]he issue of rehabilitation for purposes of Section 1112(b)(4)(A) is not the technical one of whether the debtor can confirm a plan, but, rather, whether the debtor's business prospects justify continuance of the reorganization effort." *In re LG Motors, Inc.*, 422 B.R. 110, 116 (Bankr. N.D. Ill. 2009) (internal quotations and citations omitted). Thus, where a debtor is merely planning to liquidate his assets rather than attempt any meaningful rehabilitation of his business, courts have found the absence of a reasonable likelihood of rehabilitation and correspondingly "cause" to convert the Debtor's case. *See Loop Corp.*, 379 F.3d at 516 ("Because the debtors here intended to liquidate their assets rather than restore their business operations, they had no reasonable likelihood of rehabilitation."). Put another way, while "[r]eorganization encompasses rehabilitation and may contemplate liquidation . . . [r]ehabilitation on the other hand, may not include liquidation.'" *Id.* (quoting *In re The Ledges Apartments,* 58 B.R. 84, 87 (Bankr. D. Vt. 1986)).

Debtor here has no real ability to revitalize his real-estate investment business and instead has proposed nothing more than a liquidating plan spread over more than a decade. Under the debtor's most recent plan, the debtor proposes that various non-debtor entities in which the Debtor holds a fractional interest will – years from now – liquidate their real estate holdings. Debtor proposes that half of any distribution that flows to the Debtor will be paid to unsecured creditors while Debtor retains the balance to pay other unspecified obligations. (4th Am. Plan §§ 5.4(d)-(h) (providing that non-debtor entity sells or refinances property with debtor's presumed share of proceeds being split with unsecured creditors). Such plan is not an attempt at a rehabilitation but is instead an extended liquidating plan. In the face of the mounting

13

administrative expenses both in this case and by the non-debtor entities in which Debtor owns an interest and constitute the principal assets by which the Debtor hopes to fund his plan, "cause" under Section 1112(b)(4)(A) exists requiring the Court to covert or dismiss this case.

### III. Creditors Interests Are Best Served by Converting the Case to Chapter 7.

In the face of "cause," Section 1112(b)(1) directs the Court to either convert the case to one under chapter 7 or dismiss it, whichever is in the best interests of creditors and the estate. Creditors are generally best served when the largest number of creditors will be paid the largest amount of money in the shortest amount of time. *See In re Aurora Memory Care LLC*, 589 B.R. at 643. Conversion is the preferable course where more creditors will quickly be paid more money if a neutral trustee is installed, who can take control of what remains of the debtor's property and liquidate it with for the benefit of creditors, rather than the debtor. *In re Rey*, 2006 Bankr. LEXIS 1803, at *25-26 (Bankr. N.D. Ill. Aug. 21, 2006). If there are assets that may be consumed unless a trustee is appointed, conversion is appropriate. *In re Express Freight Lines, Inc.*, 119 B.R. 1006, 1018-19 (Bankr. E.D. Wis. 1990).

In *Aurora Memory Care LLC*, the court found caused existed where the debtor had no reasonable likelihood of reorganizing because its hopes of securing post-petition financing were "visionary projections" and debtor provided no other alternatives for rehabilitation. *Aurora Memory Care LLC*, 589 B.R. at 642. The bank sought dismissal to allow it to proceed with foreclosure. *Id*. at 644. Noting that the debtor's schedules indicated some equity in the property, the court instead held the prudent course was to covert rather than dismiss, reasoning that "[c]onversion will allow a trustee to investigate whether a sale of the facility would indeed produce a significant dividend for [Debtor's] unsecured creditors." *Id*. The Court observed that if the chapter 7 trustee concluded a sale was not worthwhile, a 'no distribution' report would be

filed, and the case will close. *Id*. Similarly, here, Debtor has projected in its latest plan of reorganization that the real property held by Capital Ventures – an entity the Debtor wholly owns – projects to have value of more than a million dollars above its secured debt by 2030. Given such projections, it appears to be in the best interests of creditors to afford an impartial chapter 7 trustee the opportunity, at a minimum, to investigate whether such value can be monetized presently to afford unsecured creditors immediate relief.

**WHEREFORE,** for the foregoing reasons, the Official Committee of Unsecured Creditors respectfully requests the Court enter an order converting this case to one under chapter 7, or, alternatively, dismiss it.

Dated: February 20, 2019				Respectfully Submitted,

**OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF MICHAEL A. GRAL**

By:	/s/	John F. Hiltz
		(One of Its Attorneys)

John F. Hiltz (Illinois # 6289744)
Blair R. Zanzig (Illinois # 6273293)
Alex J. Whitt (Illinois # 6315835)
**HILTZ & ZANZIG LLC**
53 West Jackson Blvd., Suite 205
Chicago, Illinois 60604
Telephone: 312.566.9008
Facsimile: 312.566.9015

# EXHIBIT A

**SUMMARY OF MONTHLY NET INCOME AS REPORTED IN
MICHAEL A. GRAL'S MONTHLY OPERATING REPORTS**

| Monthly Operating Report | Net Income Reported |
|---|---|
| Jan-19 [Dkt. #1634] | ($248.01) |
| Dec-18 [Dkt. #1623] | ($42,622.5) |
| Nov-18 [Dkt. #1616] | ($1,129.37) |
| Oct-18 [Dkt. #1597] | ($482.15) |
| Sep-18 [Dkt. #1580] | ($7,762.66) |
| Aug-18 [Dkt. #1553] | ($1,453.41) |
| Jul-18 [Dkt. #1529] | ($44,413.43) |
| Jun-18 [Dkt. #1482] | ($24,357.85) |
| May-18 [Dkt. #1439] | $2,222.12 |
| Apr-18 [Dkt. #1394] | $177.4 |
| Mar-18 [Dkt. #1312] | ($1,275.16) |
| Feb-18 [Dkt. #1220] | $2,220.17 |
| Jan-18 [Dkt. #1176] | ($77.50) |
| Dec-17 [Dkt. #1081] | $251.55 |
| Nov-17 [Dkt. #1022] | ($3,937.27) |
| Oct-17 [Dkt. #974] | ($6,858.56) |
| Sep-17 [Dkt. #951] | ($3,827.45) |
| Aug-17 [Dkt. #922] | ($21,431.63) |
| Jul-17 [Dkt. #894] | ($23,193.82) |
| Jun-17 [Dkt. #871] | ($16,900.44) |
| May-17 [Dkt. #827] | ($398.93) |
| Apr-17 [Dkt. #780] | ($11,849.60) |
| Mar-17 [Dkt. #740] | ($33,050.13) |
| Feb-17 [Dkt. #716] | ($36,216.52) |
| Jan-17 [Dkt. #682] | ($19,177.69) |
| Dec-16 [Dkt. #650] | ($11,800.94) |
| Nov-16 [Dkt. #594] | $351.87 |
| Oct-16 [Dkt. #552] | $24,697.22 |
| Sep-16 [Dkt. #496] | ($1,892.49) |
| Aug-16 [Dkt. #452] | ($12,916.34) |
| Jul-16 [Dkt. #341] | ($4,383.83) |
| Jun-16 [Dkt. #295] | $5,231.17 |
| May-16 [Dkt. #246] | $2,824.33 |
| Apr-16 [Dkt. #159] | $9,590.17 |
| Mar-16 [Dkt. #108] | $674.07 |